UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

00 JUN 30 PM 1:48

U.S. DISTRICT COURT
N.D. OF ALABAMA

RODERICK JEROME BELL,       )
                            )
        Plaintiff,          )
                            )
vs.                         )      Civil Action No. CV-99-S-87-NE
                            )
CITY OF HUNTSVILLE, ALABAMA,)
a municipal corporation, and)
GERALD E. NORRIS, in his    )
individual capacity,        )
                            )
        Defendants.         )

**ENTERED**

JUN 3 0 2000

### MEMORANDUM OPINION

This action is before the court on defendants' motion for summary judgment. Upon consideration of the motion, briefs, evidentiary submissions, and pleadings, the court concludes it is due to be granted in part and denied in part.

Plaintiff's description of the events leading to this action differs markedly from the scenario related by defendant Gerald Norris. Federal Rule of Civil Procedure 56(c) and binding case law gloss layered thereon require this court to view contested facts in the light most favorable to plaintiff, the non-moving party. *See, e.g., Jackson v. Sauls*, 206 F.3d 1156, 1159 (11th Cir. 2000) ("Although the parties' versions of the ... incident differ drastically, the summary judgment posture of this case requires us to consider first the events in the light most favorable to



Plaintiffs."). Moreover, defendant Norris has interposed a qualified immunity defense to plaintiff's claims, thereby raising "a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case." *Johnson v. Jones*, 515 U.S. 304, 313, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995). This court accordingly must "resolve all issues of material fact in favor of the plaintiff ... [and] then answer the legal question of whether the defendant[] [is] entitled to qualified immunity under that version of the facts." *Thornton v. City of Macon*, 132 F.3d 1395, 1397 (11th Cir. 1998). The following facts, therefore, either are not disputed, or are stated in the light most favorable to plaintiff.[1]

## I. FACTUAL BACKGROUND

Plaintiff, Roderick Jerome Bell, arose early on the morning of Saturday, January 18, 1997, in preparation for working an overtime shift at NASA's George C. Marshall Space Flight Center ("Marshall") near Huntsville, Alabama, where he was employed as a quality assurance specialist. His trip to Marshall that day was the first

---

[1] At various points in the remainder of this opinion the court will footnote statements by defendant Norris that differ significantly from those made by plaintiff. The court is neither weighing evidence nor assessing credibility when doing so, but simply illustrating the marked disparity between the parties' accounts of events.

time he had driven an automobile in "[p]robably a year."[2]  In fact,

he drove without a valid license; his driving privileges had been

revoked in 1995, due to a state conviction for driving under the

influence of alcohol.  Plaintiff twice had been convicted for

driving under the influence as of January 18, 1997.

Plaintiff arrived at Marshall at 7:00 a.m. and worked until

about 10:00 p.m. that evening.[3]  He intended to drive directly

home, but was required to drive an alternate route, because the

security gate on Rideout Road closed before the late hour at which

he departed Marshall.

> Q.   But since [Rideout Road] was closed, what had
> you -- what route had you planned to take?
>
> A.   Just go straight down Goss Road, turn left on
> Patton, Patton turns to Jordan.  Just kept straight down
> Jordan Lane, turn right on Oakwood, and make a left turn
> on Pulaski Pike, go straight to my subdivision.[4]

Even by that route, plaintiff estimated that it should have taken

no more than thirty minutes to drive home.  Necessarily, then, the

---

[2] Plaintiff's deposition at 93.   Both parties submitted portions of
plaintiff's deposition as part of their evidentiary submission in support of or
opposition to summary judgment.   See Doc. Nos. 45 (Exhibit 12 to defendants'
evidentiary submission in support of summary judgment) & 47 (Exhibit 5 to
plaintiff's evidentiary submission in opposition to summary judgment).   This
court, after conferring with both parties, obtained a full copy of plaintiff's
deposition.   See Doc. No. 49.

[3] See id. at 33-39.  Plaintiff testified that his shift actually ended at
approximately 3:30 p.m.; he stayed long after that time, however, to complete
other work tasks.  Plaintiff said it was not uncommon for him to work beyond his
normal shift to accomplish all work tasks.

[4] Id. at 43.

incidents leading to this suit should have occurred about 10:30 p.m.[5]

Plaintiff's trip was uneventful until he arrived at the intersection of Oakwood Avenue with Pulaski Pike.  His deposition testimony captures the substance of what occurred there.

> Q.   Tell me what happened as you approached the intersection of Oakwood and Pulaski.
>
> A.   I came to the intersection.  The light was green.  I got in the turn lane.  I had my signal on.  As I went to make the turn, I started to turn, a car that was approaching me, which was -- it looked like I was going to be able to make it in front of him, all of a sudden he sped up, coming toward me, and I slammed on my brakes.
> And when I slammed on my brakes, my vehicle spun a little bit.  The guy went past me, in the right-hand lane.  When he went past, I pulled off, proceeding toward my home.
>
> . . .
>
> Q.   And when you say your vehicle spun, tell me what you mean by that.
>
> A.   Just the rear end kind of spun around a little bit.  It didn't even take me out of the intersection, it didn't take me out of the lane.
>
> Q.   So, your car never moved out of the lane that you were traveling in; is that right?  The left hand turn lane?
>
> A.   The -- As I was turning, I was going under the

---

[5] Officer Norris claims, and the arrest report indicates, however, that the incident occurred at approximately 1:00 a.m. during the early morning hours of the following day, January 19, 1997.

4

light, and where the lane comes out the other side, I was already into it like this (indicating). And when I saw this car speeding up and I saw that I wasn't going to make it, I put on brakes as I was turning and my vehicle turned a little bit like this (indicating). And, I guess, the rear end kind of shifted over in what would've been the right lane extended through the intersection. But it didn't go any further than that.[6]

Plaintiff later conceded that his spinning vehicle came to rest in the "inside westbound lane" of Oakwood Avenue.[7] He then "put [his auto] back in first gear," completed the turn, and proceeded northwardly along Pulaski Pike in the direction of his home.[8]

Defendant Gerald Norris, a uniformed police officer for the City of Huntsville, Alabama, was on patrol duty at the time, and observed plaintiff's turn at the Oakwood-Pulaski intersection.[9]

---

[6] Plaintiff's deposition at 44-45, 48-49.

[7] *Id.* at 121.

[8] *Id.* at 49.

[9] Officer Norris' account of the incident differs significantly from plaintiff's version:

> I was in the left northbound lane of Pulaski Pike, south of the intersection when I observed plaintiff ... approach the intersection traveling eastbound on Oakwood Avenue at a high rate of speed which was not reasonable or prudent for that location. Bell's lane of travel had a red light, but Bell ran the red light and entered the intersection still traveling at a high rate of speed. After entering the intersection, Bell slammed on his brakes, causing his vehicle to spin approximately 180 degrees in the intersection and come to rest facing west. As a consequence, other vehicles at the intersection were forced to slam on their brakes and take evasive action to avoid collisions, resulting in a conglomeration of vehicles in the intersection.

Affidavit of Gerald E. Norris, attached as Exhibit 1 to defendants' evidentiary submission in support of summary judgment, at ¶ 3.

Norris fell in behind plaintiff's automobile and actuated his cruiser's light bar.  Plaintiff did not immediately respond to the signal; he said that he did not notice Officer Norris behind him until traveling through the intersection of Sparkman Drive with Pulaski Pike.

> Q.   Okay.  Let me stop you there.  Let's go back and talk about that, and then we'll come back to this. So, is it your testimony that you first saw the lights on top of Officer Norris' vehicle after you passed through the intersection of Sparkman and Pulaski?
>
> A.   Yes, I was -- As I was going through the intersection, the light changed, as I was approaching the intersection, because the car in the left-hand lane was stopped there waiting on the light.  And as I was approaching, the light changed, and I went past that car. At that point, that's when I saw Officer Norris' lights. So when I came to the next right turn, I made a right turn, and I pulled off and stopped.
>
> Q.   So, you pulled off at the very next right turn?
>
> A.   The next.
>
> Q.   Do you know what that street was?
>
> A.   Moss. [10]

---

[10] *Id.* at 55.  Again, Officer Norris' account of the same events differs significantly from plaintiff's:

> Bell was traveling at a speed of approximately eighty miles per hour.  I moved behind Bell's vehicle and activated my emergency blue lights approximately as I crossed the intersection of Pulaski Pike and Cave Avenue [four streets before Sparkman Drive].  ... Bell did not stop after I activated my lights and siren, but rather increased his speed to approximately ninety five miles per hour.  Bell continued north past three more streets on the right before reaching the intersection of Pulaski Pike and Sparkman Drive.  Throughout the time Bell traveled north on Pulaski I observed his vehicle weaving

6

Plaintiff parked his automobile on the right shoulder of the side street, and Officer Norris parked his cruiser on the left shoulder, slightly ahead of plaintiff's vehicle. Without awaiting instructions from Officer Norris, plaintiff stepped from his vehicle.[11] Officer Norris ordered plaintiff to lie on the ground.

> Q.   All right.  What happened at that point?
>
> A.   The next thing I remember was Officer Norris telling me to get down on the ground.  And I tried to turn to get myself situated so I could get down.  The next thing I felt was a sharp thud from behind.  I went down, face first, put my arms down to try to catch myself.  I threw my arms out in front of me to catch myself, my head still hit the ground.
>
> Officer Norris pinned me to the ground with his knee in the middle of my back, told me to put my hands behind my back, he handcuffed me.  And at that point he left me handcuffed there.   And I remember starting to say something to him but I just, what I said doesn't come to me, you know.  And then he went off to my vehicle.[12]

---

across the roadway.

. . .

> Bell continued north past two more streets on the right [the first of which is Moss Road] until he reached a third street, Hester Lane.  ... As we neared Hester Lane ... I pulled beside the driver's side of Bell's vehicle in an effort to move in front of him.  Bell slammed on his brakes and turned right onto Hester Lane.  Bell turned so quickly onto Hester Lane that I could not turn to follow him and drove past Hester Lane.  ... I braked, backed up to Hester Lane, turned right onto Hester Lane and parked my vehicle.

*Id.* at ¶¶ 5, 7.

[11] Plaintiff stated in deposition that he always exits his vehicle when stopped by a police officer.  He cited no reason for this behavior.  *See* Plaintiff's deposition at 59.

[12] *Id.* at 61-62.

Plaintiff admitted he did not respond immediately to Norris'
command to "get down," but said that his failure to obey the
instruction was due to an arthritic condition in his knees and back
trouble;[13] in other words, he delayed response in an attempt to "get
situated."

> Q.  Tell me what you were doing.  What did you do
> to try to get yourself situated?
>
> A.  All right.  I kind of tried to reach for my
> car, and see what I could, you know, just try to get
> down.  You know, it's not something I have to do on a
> regular basis.
>
> Q.  Well, do you remember what you did on this
> occasion?
>
> A.  I just kind of turned around, tried to reach
> for my car or something.  I don't know.
>
> Q.  Well, did you turn away from Officer Norris?
>
> A.  Yeah, I did.
>
> Q.  He didn't know what you were reaching for, did
> he?
>
> A.  There was nothing out there but the car.
>
> . . .
>
> Q.  How far away from your vehicle were you at the
> time?
>
> A.  I couldn't reach it.[14]

---

[13] *See id.* at 62-63.

[14] *Id.* at 63-64.  Officer Norris, on the other hand, claimed that:

Plaintiff suffered no serious injury as a result of being forcibly taken to the ground and handcuffed.  His back was "sore for a while"[15] and his face was slightly abraded, but plaintiff did not consult a physician for treatment of either condition.

Officer Norris searched plaintiff's vehicle.  A member of the police department's "K-9" unit responded to Norris' call for back-up, and his German Shepherd sniffed the car.  Norris told plaintiff he and the dog were searching for "[g]uns and drugs."[16]  None were found.  Officer Norris then placed plaintiff in the police cruiser and drove him to the city jail.  Plaintiff's vehicle was impounded.

Plaintiff was charged with four criminal offenses:  running a red light; driving under the influence of alcohol; attempting to flee or elude an officer; and, driving while license revoked.  He was convicted of all four charges in the City of Huntsville Municipal Court.  Plaintiff, with the assistance of counsel, then

---

> Bell broke free of the seat belt and started to move toward me and away from the vehicle as I ran toward him, causing us to collide. I pushed Bell away and Bell took a threatening "boxer's stance," i.e., one foot back and both hands up, preparing to strike me. Bell's behavior caused me to be extremely concerned for my safety. I was alone and did not know Bell or what he might be capable of, and Bell's behavior was erratic and led me to believe he was going to attack me.

Norris affidavit at ¶ 8.  Once he placed plaintiff in custody, Officer Norris observed that "Bell's eyes were bloodshot and glassy and he had an odor of an alcoholic beverage on his breath."  *Id.* at ¶ 10.

[15] Plaintiff's deposition at 70.

[16] *Id.* at 77.

9

appealed to the Circuit Court of Madison County, Alabama, for trial *de novo*.   Plaintiff ultimately pled guilty to the offense of driving while his license was revoked, but proceeded to trial on the remaining charges.   He was acquitted by a jury verdict.   This suit followed.

## II. DISCUSSION

Plaintiff contends Officer Norris and the City of Huntsville are liable under 42 U.S.C. § 1983 for violations of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.[17]   He also contends both defendants are liable under

---

[17] 42 U.S.C. § 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) (citations and internal quotation marks omitted).
The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.
The Fourteenth Amendment provides, in relevant part, that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.
The Fourth Amendment was made applicable to the states through the due process clause of the Fourteenth Amendment in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

Alabama law for assault, battery, and false arrest.  Finally, he sues Officer Norris for malicious prosecution.  The court addresses these claims in turn.

## A.   Federal Claims

Though not stated very artfully, plaintiff asserts Fourth Amendment claims for excessive use of force, unlawful arrest, and unlawful search and impoundment of his vehicle, as well as a claim of denial of due process under the Fourteenth Amendment.  At the core of plaintiff's complaint is the contention that Officer Norris had no plausible basis for interrupting his drive home from work on January 18, 1997:  "There was no need for any of it to happen."[18] Stated differently, plaintiff's federal claims arise out of the allegedly unlawful stop,[19] seizure (handcuffing and arrest), and search executed by Officer Norris on the night in question.

As a preliminary matter, this court concludes plaintiff's excessive force claims must be evaluated through the sharper lens of the Fourth Amendment, rather than the opaque concept of Fourteenth Amendment "substantive due process."  The Supreme Court instructs:

----

[18] Plaintiff's deposition at 69-70.

[19] As the Eleventh Circuit recently observed, Officer Norris' command for plaintiff to lie on the ground "did not convert this investigatory stop or seizure into an arrest."  Jackson v. Sauls, 206 F.3d 1156, 1166 n.13 (11th Cir. 2000) (citations omitted).

11

> <u>all</u> claims that law enforcement officers have used
> excessive force — deadly or not — in the course of an
> arrest, investigatory stop, or other "seizure" of a free
> citizen should be analyzed under the Fourth Amendment and
> its "reasonableness" standard, rather than under a
> "substantive due process" approach. Because the Fourth
> Amendment provides an explicit textual source of
> constitutional protection against this sort of physically
> intrusive governmental conduct, that Amendment, not the
> more generalized notion of "substantive due process,"
> must be the guide for analyzing these claims.

*Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1872, 104

L.Ed.2d 443 (1989) (emphasis in original).   Accordingly, to the

extent that plaintiff attempts to allege a "substantive due

process" claim under the Fourteenth Amendment, that claim is due to

be dismissed against both defendants.

Under the Fourth Amendment, if an arrest is deemed to have

been unlawful, <u>any</u> force employed by the police officer when

effecting the arrest is "excessive."  *See Nolin v. Isbell*, 207 F.3d

1253, 1258 (11th Cir. 2000) (recognizing prior Eleventh Circuit

case law[20] holding that "any use of force" when effecting "arrests

without probable cause" is "inappropriate": *i.e.*, contravenes the

Fourth Amendment).   Not surprisingly, therefore, the Eleventh

Circuit recently reiterated that "[u]nder this Circuit's law ... a

claim that any force in an illegal stop or arrest is excessive is

---

[20] *See, e.g.*, Sheth v. Webster, 145 F.3d 1231 (11th Cir. 1998); Thornton
v. City of Macon, 132 F.3d 1395 (11th Cir. 1998).

12

subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) (citing *Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995)).

> *Williamson's* rule makes sense because if a stop or arrest is illegal, then there is no basis for any threat or any use of force, and an excessive force claim would always arise but only collaterally from the illegal stop or arrest claim.  The correct analysis is that the excessive force claim is subsumed in the illegal stop or arrest claim, as recognized in *Williamson*, where a plaintiff contends the force was excessive because there was no basis for any force.

*Jackson*, 206 F.3d at 1171.  In like manner, plaintiff's unlawful search and impoundment claim is derivative of the unlawful arrest claim, given plaintiff's contention that Officer Norris should not have interrupted his drive home in the first place.

If, on the other hand, an arrest is deemed to have been lawful, excessive force remains as a discrete claim, and is analyzed under the Fourth Amendment reasonableness standard articulated by the Supreme Court in *Graham*.

> It is well established that "the right to make an arrest or investigatory stop carries with it the right to use some degree of physical coercion or threat thereof to effect it." [*Graham*, 490 U.S.] at 396, 109 S.Ct. [at 1872].  To determine whether the force used is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the

countervailing governmental interests at stake. *See id.*;
*Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85
L.Ed.2d 1 (1985); *Crosby v. Paulk*, 187 F.3d 1339, 1351
(11th Cir. 1999). Because "[t]he test of reasonableness
under the Fourth Amendment is not capable of precise
definition or mechanical application," *Bell v. Wolfish*,
441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979),
"its proper application requires careful attention to the
facts and circumstances of each particular case,
including the severity of the crime at issue, whether the
suspect poses an immediate threat to the safety of
officers or others, and whether [the suspect] is actively
resisting arrest or attempting to evade arrest by
flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

Therefore, "[u]se of force must be judged on a case-
by-case basis 'from the perspective of a reasonable
officer on the scene, rather than with the 20/20 vision
of hindsight.'" *Post v. City of Fort Lauderdale*, 7 F.3d
1552, 1559 (11th Cir. 1993) (quoting *Graham*, 490 U.S. at
396, 109 S.Ct.[at 1872]). "The calculus of
reasonableness must embody allowance for the fact that
police officers are often forced to make split-second
judgments — in circumstances that are tense, uncertain,
and rapidly evolving — about the amount of force that is
necessary in a particular situation." *Graham*, 490 U.S.
at 396-97, 109 S.Ct. 1865. The reasonableness inquiry is
also an objective one. "[T]he question is whether the
officers' actions are 'objectively reasonable' in light
of the facts and circumstances confronting them, without
regard to their underlying intent or motivation."
*Graham*, 490 U.S. at 397, 109 S.Ct. 1865. "An officer's
evil intentions will not make a Fourth Amendment
violation out of an objectively reasonable use of force;
nor will an officer's good intentions make an objectively
unreasonable use of force constitutional." *Id.* at 397,
109 S.Ct. 1865; *see Scott v. United States*, 436 U.S. 128,
138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). Furthermore,
this Court has concluded that "Fourth Amendment
jurisprudence has staked no bright line for identifying
force as excessive," that "[t]he hazy border between
permissible and forbidden force is marked by a

14

> multifactored, case-by-case balancing test," and "[t]he
> test requires weighing of all the circumstances." *Smith
> v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997).

*Jackson*, 206 F.3d at 1169 (footnote omitted).

The court now addresses the propriety of plaintiff's Fourth
Amendment claims as to Officer Norris in his individual capacity,
and then the City of Huntsville.

### 1.   Officer Norris

Officer Norris claims plaintiff's § 1983 claims against him
are barred by the doctrine of qualified immunity.

> Qualified immunity shields a § 1983 defendant from
> liability for harms arising from discretionary acts, as
> long as the discretionary acts do not violate clearly
> established federal statutory or constitutional rights of
> which a reasonable person would have known.  ...  For an
> asserted right to be clearly established for purposes of
> qualified immunity, "the law must have earlier been
> developed in such a concrete and factually defined
> context to make it obvious to all reasonable government
> actors, in the defendant's place, that 'what he is doing'
> violates federal law."  ...  The burden of showing that
> an officer violated clearly established law falls on the
> plaintiff, and a plaintiff's citation of general rules or
> abstract rights is insufficient to strip a § 1983
> defendant of his immunity.  ...  A reasonable officer's
> awareness of the existence of an abstract right, such as
> a right to be free of excessive force or an investigatory
> stop without reasonable suspicion, does not equate to
> knowledge that his conduct infringes the right.  "If case
> law, in factual terms, has not staked out a bright line,
> qualified immunity almost always protects the defendant."
> ...
>
> Additionally, the standard for determining if an
> officer violated clearly established law is an objective

one and does not include inquiry into the officer's
subjective intent or beliefs.   ...   Thus, a police
officer is entitled to qualified immunity if a reasonable
police officer could have believed his or her actions
were lawful in light of clearly established law and the
information possessed by the officer at the time the
conduct occurred.   ...

*Jackson*, 206 F.3d at 1164-65 (citations and footnote omitted).

It is undisputed that defendant Norris was operating within
the scope of his discretionary authority as a uniformed police
officer when stopping plaintiff's vehicle, placing plaintiff under
arrest, and searching his vehicle.  Plaintiff admits that much in
his complaint:  "Defendant Gerald E. Norris ... at all times herein
mentioned was acting under color of state law within the nature and
scope of his official duties as a member of the City of
Huntsville's police department."[21]

It is clear under Alabama law that "a vehicle may be stopped
on less than probable cause." *Cone v. City of Midfield*, 561 So. 2d
1126, 1128 (Ala. Crim. App. 1990).  Rather, only reasonable
suspicion is required to justify a traffic stop, such as that
undertaken by Officer Norris in this case.  *See Gwarjanski v.
State*, 700 So. 2d 357, 358 (Ala. Crim. App. 1996) (citing *Watts v.
State*, 651 So. 2d 1105, 1107 (Ala. Crim. App. 1994), for the

---

[21] Complaint (Doc. No. 1) ¶ 5.

proposition that "'a police officer has the authority to make a forcible stop of a person when the officer has a reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity'"). *Cf. Delaware v. Prouse*, 440 U.S. 648, 659, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660 (1979) ("The foremost method of enforcing traffic and vehicle safety regulations ... is acting upon observed violations ...."); *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) ("An initial traffic stop is valid under the Fourth Amendment not only if based on an observed traffic violation, but also if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.").

The reasonable suspicion standard was originally articulated by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and provides that a police officer may conduct a brief, investigatory stop when he has a reasonable, articulable suspicion that criminal activity is afoot. "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing of considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the

stop." *Illinois v. Wardlow*, ___ U.S. ___, 120 S.Ct. 673, 675-76, 145 L.Ed.2d 570 (2000) (citation omitted). *Compare Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990) (noting that probable cause exists "if the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense"). Alabama law further provides that whether or not reasonable suspicion exists to support an investigatory traffic stop depends on the "totality of the circumstances." *Gwarjanski*, 700 So. 2d at 358. Circumstances to be taken into account include "the behavior of the suspect, such as erratic or evasive driving patterns; the appearance of the vehicle or its occupants; the time and location of the stop ...; and the experience of the police officer." *Martin v. State*, 529 So. 2d 1032, 1033 (Ala. Crim. App. 1988) ("Police officers may stop a vehicle for investigative purposes based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant suspicion of criminal conduct on the part of the occupants of the vehicle."). "When an officer asserts qualified immunity, the issue is not whether reasonable

18

suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Jackson*, 206 F.3d at 1166 (noting that "[a] law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity").

Applying the foregoing standards to the facts recounted by plaintiff, this court finds that the manner in which he attempted to negotiate a left turn at the intersection of Oakwood Avenue with Pulaski Pike, which very nearly resulted in a collision with an oncoming vehicle, would have generated a reasonable suspicion in the mind of an objectively reasonable police officer that plaintiff was driving under the influence of alcohol. Circumstances weighing in favor of that finding include the hour at which the incident occurred[22] and the reckless manner in which plaintiff attempted the turn. Plaintiff's conduct following the near-accident would have intensified a reasonable officer's original suspicion that he was driving under the influence of alcohol. Plaintiff proceeded northwardly along Pulaski Pike for a distance he described as the equivalent of a "long city block"[23] before responding to Officer Norris' signal to pull over. Moreover, rather than stopping along

---

[22] At least 10:30 p.m.: see text *supra* at note 5.

[23] Plaintiff's deposition at 57.

19

Pulaski Pike, plaintiff turned onto a side street.[24]

In sum, the specific and articulable facts discernible from plaintiff's own deposition — his failure to yield the right-of-way to an oncoming vehicle,[25] his abrupt depression of the vehicle's brakes, the narrow avoidance of a collision, the spinning of his vehicle at least partially out of the lane in which he was traveling, plaintiff's less than prompt response to Officer Norris' signal to pull over, and his turn onto a side street rather than stopping along Pulaski Pike — would have generated a reasonable

---

[24] Plaintiff stated that he did not pull off on Pulaski Pike since that road is "full of hills, curves, and turns," and lacks a shoulder. See id. at 56-57.

[25] It must be observed marginally, because Officer Norris did not assert this point on the date of arresting plaintiff, that plaintiff nevertheless violated an Alabama statute when attempting his left turn from Oakwood Avenue onto Pulaski Pike:

> The driver of a vehicle intending to turn to the left within an intersection ... shall yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard.

Alabama Code § 32-5A-111. See also id. § 32-5A-3 ("It is unlawful and, unless otherwise declared in this chapter with respect to particular offenses, it is a misdemeanor for any person to do any act forbidden or fail to perform any act required in this chapter."). Plaintiff, eastbound on Oakwood Avenue, attempted a left turn onto Pulaski Pike. He did not have a green "left turn arrow" in his favor (see plaintiff's deposition at 45-46), only a general green light, which thus required that he "yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard." Alabama Code § 32-5A-111. Plaintiff mistakenly thought he could make the left turn "free and clear" of the oncoming vehicle: "As I went to make the turn, ... it looked like I was going to be able to make it in front of him, all of a sudden he sped up, coming toward me, and I slammed on my brakes." (Plaintiff's deposition at 44.) Plaintiff does not aver that the acceleration of the oncoming vehicle was unlawful, or that it did not have a general green light in its favor as well.

suspicion in the mind of an objectively reasonable police officer that plaintiff was driving under the influence of alcohol. *See Jones v. State*, 579 So. 2d 66, 68-69 (Ala. Crim. App. 1991) (police officers, who ultimately arrested appellant for driving under the influence of alcohol, had reasonable suspicion of criminal conduct based on squealing of tires and revving of engine by appellant).

Following the stop, plaintiff stepped out of his vehicle without being instructed to do so. In view of the events that had just transpired, the time of night, and the fact that Officer Norris was alone, a reasonable police officer in the same circumstances would have been justified in ordering plaintiff to the ground. *See Jackson*, 106 F.3d at 1171-72 ("[T]his Court has held that an officer's ... ordering a person stopped to lie on the ground does not necessarily constitute excessive force during an investigatory stop.") (citing *Courson v. McMillian*, 939 F.2d 1479 (11th Cir. 1991)).

Rather than responding immediately to that instruction, however, plaintiff turned away from Officer Norris and made a movement in the direction of his automobile. Based on these undisputed facts, a reasonable police officer would have possessed arguable probable cause[26] to arrest plaintiff, believing that he

---

[26] Arguable probable cause exists when "an officer reasonably could have

21

intended either to resist interrogation or to leave the scene.

Officer Norris forced plaintiff to the ground, placed his knee in plaintiff's back, and handcuffed him. That conduct resulted in back soreness and an abrasion to plaintiff's face, neither of which required medical attention. The force thus employed by Officer Norris in effecting plaintiff's arrest must be characterized as *de minimis*, and thereby insufficient to support plaintiff's claim of excessive force under the Fourth Amendment. *See Nolin*, 207 F.3d at 1257 (concluding that Fourth Amendment is not violated where injuries resulting from police officer's use of force consist of "bruising to [an arrestee's] forehead, chest, and wrists" that did not require medical treatment).[27]

In sum, Officer Norris' initial stop of plaintiff's vehicle was supported by arguable reasonable suspicion, and his ultimate arrest of plaintiff was warranted under the circumstances. Accordingly, the Eleventh Circuit authority discussing the

---

believed that probable cause existed, in light of the information the officer possessed." *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997). *See also Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999) ("An arrest without probable cause is unconstitutional, but officers who make such an arrest are entitled to qualified immunity if there was arguable probable cause for the arrest.").

[27] In *Nolin*, the police officer mistakenly believed that a teenager engaged in horseplay was fighting, and for that reason "grabbed him from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him." 207 F.3d at 1255.

impropriety of using any force whatsoever in the absence of reasonable suspicion or probable cause has no application. *See id.* at 1258 (summarizing, and then distinguishing, that authority).[28] Further, when effecting the arrest, Officer Norris applied only *de minimis* force which, "without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Id.* at 1257. Qualified immunity thus shields Officer Norris from liability under § 1983 for the constitutional torts of unlawful arrest and excessive use of force.

Officer Norris also is shielded from liability for plaintiff's derivative Fourth Amendment claim of unlawful search and impoundment of his automobile, because those actions were taken based on arguable probable cause. *See United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1222 (11th Cir. 1993) ("Because [the defendant's] arrest was proper, the search of the passenger compartment of his truck was proper as a search incident to an arrest."); *Byrd v. Clark*, 783 F.3d 1002, 1005 (11th Cir. 1986) ("Given the finding of probable cause to stop and detain plaintiff Byrd, we find that the officers would have been justified in conducting a search ...."); *United States v. Hunnicutt*, 135 F.3d

---

[28] *See supra* note 20.

1345, 1351 (10th Cir. 1998) ("Thus, the officers properly impounded the vehicle in their community-caretaking function. ... Alternatively, the officers properly impounded the vehicle to later search it based on probable cause."). Plaintiff's federal claims against Officer Norris, therefore, are due to be dismissed.

### 2. City of Huntsville

It is well-established in § 1983 jurisprudence that a municipality cannot be held liable under a *respondeat superior* theory for its police officers' violations of the Fourth Amendment. *See Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) ("In particular, we conclude that a municipality cannot be held liable solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.") (emphasis in original). Rather, the City of Huntsville "may be held liable for the actions of [Officer Norris] only when municipal 'official policy' causes a constitutional violation." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

Based on this court's finding that the doctrine of qualified immunity shields Officer Norris from plaintiff's claims, he has no basis to hold the City of Huntsville liable. *See Los Angeles v.*

*Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1985) (*per curiam*) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have <u>authorized</u> the use of constitutionally excessive force is quite beside the point.") (emphasis in original); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) (noting that "an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred"). Plaintiff's inability to establish a constitutional deprivation by Officer Norris necessarily shields his employer from liability. Accordingly, plaintiff's federal claims against the City of Huntsville also are due to be dismissed.

Even if plaintiff could establish that Officer Norris was not shielded by the doctrine of qualified immunity, he still has failed to link Norris' actions to city policies. While obliquely referring to a number of law enforcement policies promulgated by the city, plaintiff is unable to establish a causative connection between those policies and the injuries he suffered at the hands of Officer Norris.[29] Causation, a necessary element of a valid § 1983

---

[29] Defendants argue this point as follows:

Bell does not even allege in the complaint that the City had a policy, practice or custom <u>which led</u> to the actions complained of. Rather, Bell alleges only that the City's failure to take any action

25

claim, is thus lacking with respect to the City of Huntsville.  *See*

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197,

1202, 103 L.Ed.2d 412 (1989) (noting that "a municipality can be

found liable under § 1983 only where the municipality itself causes

the constitutional violation at issue").

**B.   State Law Claims**

Plaintiff asserts supplemental state law claims of assault,

battery, and false arrest against both defendants, and malicious

prosecution against Officer Norris alone.   Akin to his claim of

qualified immunity regarding plaintiff's federal claims, Officer

Norris argues that plaintiff's state law claims should be dismissed

under Alabama's doctrine of discretionary function immunity.  *See*

Alabama Code § 6-5-338(a) (stating that police officers like

plaintiff are shielded from "tort liability arising out of ...

---

<u>after</u> the incident in response to the incident demonstrated the
City's approval of the actions of Norris ....

. . .

Nowhere in the complaint does Bell allege that the City had in
effect, <u>prior to the incident</u>, a policy, practice or custom
permitting, encouraging or tolerating unconstitutional acts such as
those committed by Norris.  Nowhere in the complaint does Bell
allege that such a policy, practice or custom was the cause of
Officer Norris' alleged unconstitutional actions, and the pleading
deadline in this action has long passed.

Defendants' brief in support of motion for summary judgment and Rule 56(c)
narrative summary of undisputed facts (Doc. No. 46), at 48-49, 50 (emphasis in
original).

conduct in performance of any discretionary function within the line and scope of ... law enforcement duties"). Qualified immunity analysis and discretionary function immunity analysis differ, in that a plaintiff must establish that a police officer acted in bad faith, maliciously, or willfully in violating state law to avoid application of the latter doctrine. *See Sheth v. Webster*, 145 F.3d 1231, 1240 (11th Cir. 1998) ("We do not suggest that entitlement to qualified immunity under federal law will always entitle a defendant to discretionary function immunity.").

With the dismissal of plaintiff's federal claims, however, the bases for this court's exercise of original jurisdiction disappear. This court accordingly exercises its discretion and dismisses plaintiff's supplemental state law claims, without prejudice to his right to assert them in an appropriate state forum. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction ...."); *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 619 n.7, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered

27

under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise supplemental jurisdiction over the remaining state-law claims.").

> At this time, the case retains no independent basis for federal jurisdiction and the only claims that remain deal with complex questions of discretionary function immunity in the state of Alabama. A proper resolution of the ... state law causes of action will require a careful analysis of Alabama law — something the courts of Alabama are in the best position to undertake and, for reasons of federalism, should undertake in this sensitive area. We conclude that the district court should dismiss the state law claims so that [plaintiff] may pursue them in state court.

*Nolin*, 207 F.3d at 1258.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is due to be granted in part and denied in part. An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this **30**th day of June, 2000.

_____
United States District Judge

28